MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:    2020 ME 45
Docket:      Cum-19-194
Argued:      December 4, 2019
Decided:     April 14, 2020

Panel:       SAUFLEY, C.J., and MEAD, GORMAN, JABAR, and HUMPHREY, JJ.*

MSAD 6 BOARD OF DIRECTORS

v.

TOWN OF FRYE ISLAND et al.

HUMPHREY, J.

[¶1]  The Town of Frye Island appeals from a judgment of the Superior Court (Cumberland County, *Warren*, *J.*) determining that Frye Island may not withdraw from Maine School Administrative District 6 (MSAD 6) in the absence of legislation specifically authorizing Frye Island to invoke the statutory withdrawal process laid out in 20-A M.R.S. § 1466 (2018).  We affirm the judgment.

## I.  BACKGROUND

[¶2]  For nearly twenty years, Frye Island has endeavored to withdraw from MSAD 6.  This is the latest chapter in that long saga.

---

* Although Justice Alexander participated in the appeal, he retired before this opinion was certified.

[¶3]   The relevant facts are not in dispute and are drawn from Frye Island's uncontroverted statement of material facts and the trial court record. *See Lee v. Town of Denmark*, 2019 ME 54, ¶ 2, 206 A.3d 907.  In addition, many of the salient facts underlying this dispute and the intersection of those facts with the enactment of relevant legislation are chronicled in *Town of Frye Island v. State*, 2008 ME 27, ¶¶ 2-6, 940 A.2d 1065 (*Frye Island I*).

[¶4]  Frye Island is a seasonal summer community that shuts down from November through April each year.  *Id.* ¶ 2.  Although Frye Island is a member of MSAD 6, no school-aged children live on Frye Island during the school year and no residents of Frye Island have ever attended schools in the district.  *Id.*

[¶5]  Until 1997, Frye Island was part of the Town of Standish.  That year, Frye Island sought secession from Standish, and the residents of Frye Island reached an agreement with Standish whereby Standish would remain neutral with respect to legislation allowing Frye Island to secede, provided that, among other things, Frye Island would remain part of MSAD 6 and continue to contribute to its support.  Frye Island and Standish memorialized their agreement in a Memorandum of Understanding, dated April 11, 1997, which provided that Standish's neutrality was "contingent upon three conditions,"

one of which was that "Frye Island . . . remain part of [the] Standish education entity, to include responsibilities for MSAD #6 on a pro-rated basis."

[¶6]  That same year, the Legislature enacted the bill of secession, "An Act to Allow the Separation of Frye Island from the Town of Standish," as private and special legislation.  *See* P. & S. L. 1997, ch. 41.  The secession law provided that, in the event that Frye Island's voters approved secession, Frye Island "remains in [MSAD 6] or its successor and pays its proportional share of costs, unless or until such time as it withdraws from the school administrative district in accordance with applicable state law."  *Id.* § A-8.  A majority of Frye Island's voters favored secession, and Frye Island effectively seceded from Standish on July 1, 1998.  *Id.* § A-3.

[¶7]  In the months following secession, Frye Island adopted a charter, effective January 1, 1999, creating and defining its municipal government. *See* Charter of the Town of Frye Island (1999).  The charter tracked the secession law's language, stating that Frye Island would remain in MSAD 6 and pay its share of costs "unless or until such time as it withdraws from [MSAD 6] in accordance with applicable state law."  *Id.* art. IV, § 1.

[¶8]  The following year, the residents of Frye Island voted unanimously to withdraw from MSAD 6.  The Legislature responded by enacting, as

4

emergency legislation, "An Act to Clarify the Act of Separation of Frye Island from the Town of Standish," P. & S. L. 2001, ch. 8, referred to as L.D. 500. Significant to this appeal, L.D. 500 (1) reiterated the agreement, reflected in the Memorandum of Understanding, that Frye Island would remain in MSAD 6 and pay its proportional share of costs, (2) amended the secession law by deleting the words "unless or until such time as it withdraws from [MSAD 6] in accordance with applicable state law," *id.* § 1, and (3) added the following provision:

> **Authorization required.** Notwithstanding any withdrawal proceedings initiated or completed pursuant to the Maine Revised Statutes, Title 20-A, section 1405 prior to the effective date of this section, or any subsequent action taken by the Town of Frye Island, *the Town of Frye Island is a part of and may not withdraw from School Administrative District 6 or its successor unless such withdrawal is first authorized by further amendment to this chapter*.

*Id.* § 2 (emphasis added).

[¶9]   In 2009, the Legislature created a new statutory process for municipalities to withdraw from school districts.[1]  *See* P.L. 2009, ch. 580, § 9,

---

[1]  On a previous appeal to us, Frye Island challenged both L.D. 500 and a general public law, P.L. 2005, ch. 2, § D-69, also known as L.D. 1. *Town of Frye Island v. State*, 2008 ME 27, ¶ 1, 940 A.2d 1065 (*Frye Island I*).  In 2004, the Legislature created a new formula for allocating the cost of education among municipalities based on the percentage of students from each municipality attending the district's schools. *Id.* ¶ 7.  Under this statutory formula, Frye Island would not have been required to make any contribution to MSAD 6. *Id.*  L.D. 1 addressed this by exempting MSAD 6 from the generally applicable cost allocation formula. *Id.* ¶ 8.

codified at 20-A M.R.S. § 1466 (2018). Years later, in 2017, Frye Island residents voted in favor of filing a petition for Frye Island's withdrawal from MSAD 6 pursuant to section 1466. Then, in February 2018, Frye Island amended its charter, which now reads, in relevant part,

> **Preamble to Article IV.** This article addresses the circumstances of Frye Island's students. It is impractical to send those students to the school district of which Frye Island is currently a member, School Administrative District 6 (SAD 06), based on SAD 06's distance and location compared to more geographically feasible school districts. Frye Island shall consider its best options with respect to its prospective students and its taxpayers, while acknowledging its commitment to public education in Maine. Therefore, Article IV clarifies, to the extent there is any debate, that *this Charter repeals P. & S.L. 2001, ch. 8 (L.D. 500) under the authority granted to Frye Island by the Maine Constitution and the general laws of Maine*.

> **Section 1. General.** Frye Island remains a member of SAD 06 or its successor and pays it proportional share of costs, unless and until it withdraws from the school administrative district in accordance with the withdrawal procedures codified in Maine Revised Statutes, Title 20-A, section 1466, or other general laws of Maine. In the event that the Town of Frye Island is required to operate its own school system, the Voters shall provide, by Charter amendment or revision and/or ordinance, for the administration of such a system.

---

Frye Island sought a declaratory judgment that both L.D. 500 and L.D. 1 violated various provisions of the Maine and United States Constitutions. *Id.* ¶ 9. The Superior Court (*Delahanty, J.*) rejected Frye Island's constitutional challenges, found that L.D. 500 and L.D. 1 were constitutional, and entered judgment in favor of the State and MSAD 6. *Town of Frye Island v. State*, No. CV-05-712, 2007 Me. Super. LEXIS 124, at *15 (June 28, 2007). On appeal, we dismissed Frye Island's constitutional challenges to L.D. 500 as moot and affirmed the court's decision rejecting Frye Island's constitutional challenges to L.D. 1. *Frye Island I*, 2008 ME 27, ¶¶ 11-12, 17, 940 A.2d 1065.

6

(Emphasis added.)

[¶10]  On January 5, 2018, MSAD 6 filed a complaint against Frye Island, seeking a declaratory judgment that Frye Island's effort to withdraw from MSAD 6 was unlawful.  In response, Frye Island acknowledged that it sought to withdraw from MSAD 6, but denied that its effort to withdraw was unlawful and counterclaimed seeking declaratory relief.[2]  MSAD 6 answered Frye Island's counterclaim and moved to dismiss Count 3, which alleged that the secession law was unconstitutional.  In the midst of all this, two individual residents of Frye Island—Jim Hodge and Ed Rogers[3]—filed a joint motion seeking to "intervene or be joined . . . as residents and taxpayers of Frye Island to enforce and protect the same constitutional rights asserted by Frye Island under the Maine and United States Constitutions."  *See* M.R. Civ. P. 24(a), (b).

[¶11]  On June 26, 2018, the court granted MSAD 6's motion to dismiss Count 3 of Frye Island's counterclaim except as to Frye Island's claim that the

___

[2]  Counts 1 and 2 of Frye Island's counterclaim alleged that L.D. 500 was legislatively repealed by operation of law or by implication, respectively, upon the enactment of 20-A M.R.S. § 1466 (2018). Count 3 alleged that the secession law was unconstitutional and in violation of the Equal Protection and Due Process Clauses of the United States and Maine Constitutions, the special legislation and emergency legislation clauses of the Maine Constitution, the right of Frye Island to petition the government under the Maine Constitution, the right to equal taxation under the Maine Constitution, and the contracts clause of the Maine Constitution.

[3]  A third resident, Betsy Gleysteen, initially joined with Hodge and Rogers to intervene, but later voluntarily dismissed herself from the case and is not a party to this appeal.

secession law violated the special legislation clause of the Maine Constitution. *See* Me. Const. art. IV, pt. 3, § 13. The court also granted the individual residents' motion for permissive intervention on the town's remaining claims.[4] *See* M.R. Civ. P. 24(b).

[¶12]  Initially, Frye Island moved for summary judgment on Count 1 of its counterclaim and on both counts of MSAD 6's complaint. Hodge and Rogers filed an independent complaint, alleging the same constitutional violations that had previously been alleged by Frye Island in Count 3 of its counterclaim prior to the court's dismissal, and MSAD 6 moved to dismiss the intervenors' complaint.

[¶13]  On October 5, 2018, MSAD 6 filed a cross-motion for summary judgment on both counts of its complaint and on Count 1 of the Town's counterclaim, and a motion for summary judgment on the remaining two counts alleged in Frye Island's counterclaim. Rounding things out, Frye Island (along with Hodge and Rogers) filed a reply in support of its motion for summary judgment on Count 1 of the Town's complaint, an opposition to MSAD 6's cross-motion for summary judgment on Count 1 of its complaint, an

---

[4]  The court denied the individual residents' motion to intervene as to Frye Island's dismissed claims, but without prejudice to their right to file a separate action, indicating that if they did so, they could move to consolidate that action with the pending case.

8

opposition to MSAD 6's motion for summary judgment on Counts 2 and 3 of its complaint, and a cross-motion for summary judgment on Counts 2 and 3 of its complaint.

[¶14] On April 30, 2019, the court entered a final judgment (1) denying Frye Island's motion for summary judgment and its cross-motion for summary judgment; (2) granting MSAD 6's motion for summary judgment on both counts of its complaint and on all counts in Frye Island's counterclaim; and (3) granting MSAD 6's request for a declaratory judgment that Frye Island is not authorized to withdraw from MSAD 6 in the absence of legislation specifically authorizing it to invoke the withdrawal process. Frye Island timely filed a notice of appeal on May 17, 2019. *See* M.R. App. P. 2B(c).

[¶15] On May 20, 2019, the court entered an order dismissing Hodge and Rogers's independent complaint in its entirety for failure to state a claim upon which relief can be granted. *See* M.R. Civ. P. 12(b)(6). Hodge and Rogers timely filed a notice of appeal on June 7, 2019. *See* M.R. App. P. 2B(c). On June 27, 2019, the appeals were consolidated.

## II. DISCUSSION

[¶16]  The relevant facts are undisputed, and "we review the summary judgment de novo for errors of law in the court's interpretation of the relevant legal concepts." *Ross v. Acadian Seaplants, Ltd.*, 2019 ME 45, ¶ 7, 206 A.3d 283.

A.  Express Repeal of L.D. 500

[¶17]  Frye Island argues that the 2018 amendment to its Charter expressly repealed L.D. 500 by operation of law, *see* 30-A M.R.S. § 2107 (2018),[5] because the amendment was a valid exercise of its home rule authority, *see* Me. Const., art. VIII, pt. 2, § 1.

[¶18]  The home rule provision of Maine's Constitution grants municipalities "the power to alter and amend their charters on all matters, not prohibited by Constitution or general law, *which are local and municipal in character.*"  Me. Const. art. VIII, pt. 2, § 1 (emphasis added).

[¶19]  Contrary to Frye Island's contention, the question of its ability to withdraw from MSAD 6 is not purely "local and municipal in character."  The structure and language of Maine's Constitution foreclose this argument.  *See* Me. Const. art. VIII, pt. 1, § 1.  The Maine Constitution commits the general power to

---

[5]  Title 30-A M.R.S. § 2107 (2018) provides, "[p]rivate and special laws applying to a municipality remain in effect until repealed or amended by a charter revision, adoption, modification or amendment under this chapter."

10

promote education to the Legislature, and specifically authorizes the Legislature to require municipalities "to make suitable provision, at their own expense, for the support and maintenance of public schools." *Id.* The makeup of regional school units—and any attempt to withdraw from a regional school unit—implicates public school funding, an issue falling squarely within the Legislature's purview. *See Frye Island I*, 2008 ME 27, ¶¶ 15-17, 940 A.2d 1065; *School Admin. Dist. No. 1 v. Comm'r, Dep't of Educ.*, 659 A.2d 854, 857 (Me. 1995). Because Frye Island's withdrawal would implicate the financing of public education in MSAD 6, it affects not only Frye Island, but also MSAD 6, Standish, and the other towns within the district—Buxton, Hollis**,** and Limington.

[¶20] Frye Island points to the possibility that "a future withdrawal agreement . . . *may* ultimately provide for Frye Island to make substantial yearly payments to MSAD 6, thereby having zero impact on other [towns'] financial contributions." (Emphasis added). However, the opposite is also possible—a future withdrawal agreement *might not* require Frye Island to make such payments, which would affect the financial contributions of the other municipalities in the district. Guarding against the latter possibility, the Legislature enacted L.D. 500—requiring that Frye Island receive authorization from the Legislature before withdrawing from MSAD 6—as an exercise of its

constitutional power to "enforce the municipal obligation to support public education." *School Admin. Dist. No. 1*, 659 A.2d at 857.

[¶21] Although we cannot predict the outcome of any hypothetical future negotiations between Frye Island and MSAD 6, the fact that the financial commitments of other municipalities within MSAD 6 *could* be affected by the withdrawal is a strong indicator that the question of Frye Island's withdrawal is not solely "local and municipal in character." Me. Const. art. VIII, pt. 2, § 1. Therefore, the 2018 Charter amendment purporting to repeal L.D. 500 was outside the scope of Frye Island's home rule authority.

[¶22] Additionally, as 30-A M.R.S. § 3001 (2018) makes clear, a municipality may not exercise any power or function the Legislature has "denied either expressly or by clear implication."[6] L.D. 500 expressly denies Frye Island the ability to withdraw from MSAD 6 without first seeking and obtaining authorization from the Legislature; Frye Island cannot do an end-run around a validly enacted private and special law by purporting to repeal it through a charter amendment.[7]

---

[6] Moreover, 30-A M.R.S. § 3001 (2018) refers to the power of municipalities to adopt, amend, or repeal "ordinances or bylaws." The municipal action here involves a charter amendment, not an ordinance or bylaw.

[7] On this point, Frye Island misreads our holding in *City of Lewiston v. Lewiston Educ. Dirs.*, 503 A.2d 210 (Me. 1985). There, the City of Lewiston originally had a legislative charter that was created by a private and special law. *Id.* at 211. Sometime later, Lewiston adopted a new charter pursuant

12

[¶23]  "[W]here the Legislature enacts a comprehensive scheme of statewide regulation, it denies by clear implication the right of municipalities to legislate in the regulated area."  *City of Lewiston v. Lewiston Educ. Dirs.*, 503 A.2d 210, 212 (Me. 1985).  The Legislature is responsible for "enact[ing] the laws that are necessary to assure that all school administrative units make suitable provisions for the support and maintenance of the public schools." 20-A M.R.S. § 2(1) (2018); *see also* Me. Const. art. VIII, pt. 1, § 1.

[¶24]  We have previously recognized "the plenary authority of the Legislature in the control of the public school system of this state."  *City of Lewiston*, 503 A.2d at 213 (quotation marks omitted); *see also Frye Island I*, 2008 ME 27, ¶ 15, 940 A.2d 1065 (observing that "in our constitutional scheme,

---

to Maine's constitutional and statutory home rule provisions.  *Id.*  We held that the adoption of that new charter triggered the repeal of the legislative charter under the predecessor statute to 30-A M.R.S. § 2107 (2018).  *Id.* at 212.  The repeal of the legislative charter and adoption of the municipal charter had two consequences: "First, the sources of authority for provisions in the new charter are confined to the 'home rule' amendment and the implementing statutes," and "[s]econd, the power of the charter to override the general laws of the State is extinguished when it ceases to exist as a result of a special act of the Legislature."  *Id.*  We did not hold, as Frye Island contends, that "any private and special law that applies to a single municipality remains in effect only until a municipality's charter is adopted."  We recognized that Lewiston was entitled to adopt a municipal charter under its home rule authority; however, we held that the charter provision at issue, which dealt with approval of school department labor contracts, could not be justified as an exercise of Lewiston's home rule authority because, by enacting a comprehensive statutory scheme, the Legislature denied by clear implication the authority of municipalities to regulate the process for approval of school department labor contracts.  *Id.* at 212-14.  Thus, in *City of Lewiston*, we analyzed the charter provision at issue under the same home rule framework that we use to analyze the charter amendment at issue here. *Id.*  As we did in *City of Lewiston*, we conclude that the charter amendment was not a valid exercise of the municipality's home rule authority.  Therefore, it did not repeal L.D. 500.  *Cf. id.* at 214.

the Legislature is granted broad authority to legislate in the area of public education" and discussing the relevant constitutional and statutory provisions). "It is within the power of the legislature to divide or join towns into school-districts as it pleases." *Beckett v. Roderick*, 251 A.2d 427, 433 (Me. 1969) (alteration omitted) (quotation marks omitted). Put simply, "[e]ducation is a state matter." *City of Lewiston*, 503 A.2d at 213.

[¶25] The court committed no legal error in concluding that the charter amendment was not a valid exercise of home rule authority and that the charter amendment did not repeal L.D. 500 by operation of law. *See id.* at 212-14 (concluding that the city's charter provision yielded to the Legislature's authority to enact statutes governing public education).

B.    Implied Repeal of L.D. 500

[¶26] Frye Island further argues that L.D. 500 was implicitly repealed by the Legislature's enactment of the statutory withdrawal process in section 1466, which provides that "the residents of a municipality that has been a member of a regional school unit for at least 30 months may petition to withdraw from the regional school unit in accordance with this subsection." Frye Island contends that the broad language in section 1466, which seemingly

14

applies to all such municipalities, evinces a legislative intent to repeal L.D. 500 by implication.

[¶27] Repeal of legislation by implication is disfavored, and we do not apply the concept of implicit repeal in doubtful cases. *See Lewiston Firefighters Ass'n v. City of Lewiston*, 354 A.2d 154, 159 (Me. 1976). Implicit repeal may be found when a later statute encompasses the entire subject matter of an earlier one, or when a later statute is inconsistent with or repugnant to an earlier one. *Fleet Nat'l Bank v. Liberty*, 2004 ME 36, ¶ 9, 845 A.2d 1183. Implicit repeal will not be found if the statutes can be read in harmony with one another. *Id.*

[¶28] L.D. 500 and section 1466 are not inherently inconsistent and can, without much difficulty, be read harmoniously. Under L.D. 500, "the Town of Frye Island . . . may not withdraw from [MSAD 6] or its successor unless such withdrawal is first authorized by further amendment to this chapter." Section 1466, enacted after L.D. 500, lays out the general procedure that must be followed when a municipality seeks to withdraw from a regional school unit or school administrative district. Nothing in L.D. 500 absolutely prohibits Frye Island from pursuing the statutory withdrawal procedure laid out in section 1466. L.D. 500 simply requires that Frye Island first seek authorization from the Legislature in the form of an amendment to that chapter.

[¶29] It is of no consequence that section 1466 was enacted after L.D. 500. *City of Lewiston*, 503 A.2d at 212 n.2 (observing that "special legislative acts . . . control over general laws enacted *before or after* the special law" (emphasis added)). And, even if the two statutes were inconsistent, the general provisions of section 1466 would yield to the more specific provisions of L.D. 500. *Houlton Water Co. v. Pub. Utils. Comm'n*, 2016 ME 168, ¶ 21, 150 A.3d 1284 ("As a familiar principle of statutory construction, specific statutes prevail over general ones when the two are inconsistent.").

[¶30] We conclude that the court committed no error of law in determining that L.D. 500 was not implicitly repealed by the Legislature's enactment of section 1466.

C.    Special Legislation Clause

[¶31] Frye Island also argues that L.D. 500 violates the Maine Constitution's special legislation clause. *See* Me. Const. art. IV, pt. 3, § 13. "When the material facts are not in dispute, we review de novo the trial court's interpretation and application of the relevant statutes and legal concepts." *Remmes v. Mark Travel Corp.*, 2015 ME 63, ¶ 19, 116 A.3d 466.

[¶32] The special legislation clause provides that "[t]he Legislature shall from time to time, provide, as far as practicable, by general laws, for all matters

usually appertaining to special or private legislation." Me. Const. art. IV, pt. 3, § 13. The special legislation clause "is violated when special legislation is enacted when a general law could have been made applicable." *Fitanides v. City of Saco*, 2004 ME 32, ¶ 11, 843 A.2d 8 (citation omitted). However, we have recognized that, in general, "[i]t is appropriate for the legislature rather than the court to make the policy decision regarding what is practicable in a given situation."[8] *Brann v. State*, 424 A.2d 699, 704 (Me. 1981). Legislative acts are presumed constitutional. *Id.* at 705.

[¶33] L.D. 500 is an amendment to a previously enacted private and special law—the secession law—that allowed Frye Island to secede from Standish. *See* P. & S. L. 1997, ch. 41. Therefore, it follows that the Legislature would choose to amend that statute and withdraw the authority it granted through private and special legislation.[9] Given the presumption that legislative

---

[8] We have found violations of the special legislation clause in cases where special legislation attempted to exempt an individual from generally applicable requirements of the law. *See Brann v. State*, 424 A.2d 699, 704 (Me. 1981) (citing cases). The special legislation at issue here applies to a municipality, not an individual.

[9] By way of comparison, Frye Island argues that the Legislature's enactment of L.D. 1 as a general public law is "proof that general legislation is both practicable and preferable in these circumstances." *See Frye Island I*, 2008 ME 27, ¶ 8, 940 A.2d 1065. However, unlike L.D. 500, L.D. 1 was an amendment to a general public law. *Id.*

acts are constitutional, Frye Island must offer more than mere speculation that it would have been practicable to enact L.D. 500 as a general public law.

[¶34] We conclude that the trial court committed no legal error in determining that L.D. 500 does not violate the special legislation clause.

D.    Constitutional Arguments

[¶35] Frye Island argues that the court erred in dismissing its claims arising under the Due Process and Equal Protection Clauses of the United States and Maine Constitutions. *See* U.S. Const. amend. XIV, §1; Me. Const. art. I, § 6-A. Hodge and Rogers, the intervenors in this case, similarly argue that the court erred in dismissing their complaint, which alleged the same constitutional violations, for failure to state a claim upon which relief can be granted. *See* M.R. Civ. P. 12(b)(6).

[¶36] "We review the grant of a motion to dismiss de novo and examine the complaint in the light most favorable to [the plaintiff] to determine whether the[] complaint sets forth elements of a cause of action or alleges facts that would entitle [the plaintiff] to relief on some legal theory." *Dubois v. Town of Arundel*, 2019 ME 21, ¶ 8, 202 A.3d 524. The rights guaranteed by article I, section 6-A of the Maine Constitution are coextensive with those guaranteed by the Fourteenth Amendment of the United States Constitution. *See In re*

*Adoption of Riahleigh M.*, 2019 ME 24, ¶ 28, 202 A.3d 1174; *Doe v. Williams*, 2013 ME 24, ¶ 61, 61 A.3d 718; *Frye Island I*, 2008 ME 27, ¶ 14, 940 A.2d 1065.

1. Frye Island's Claims

[¶37] "The traditional principle throughout the United States has been that municipalities and other local governmental corporate entities and their officers lack capacity to mount constitutional challenges to acts of the State and State legislation." *City of New York v. State*, 86 N.Y.2d 286, 289-90 (1995). The United States Supreme Court has long applied this rule. "Being but creatures of the State, municipal corporations have no standing to invoke the contract clause or the provisions of the Fourteenth Amendment of the Constitution in opposition to the will of their creator." *Coleman v. Miller*, 307 U.S. 433, 441 (1939); *see also Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 363-64 (2009). We have also previously applied this principle. In *South Portland v. State*, 476 A.2d 690, 699 (Me. 1984), we held that a municipality, "being merely an arm of the State, has no basis in the United States Constitution for suing the State."[10]

---

[10] The last time Frye Island raised constitutional challenges to L.D. 500, we stated in dicta that "[i]t is questionable whether the Town itself has protectible rights under the due process, equal protection, and contract clauses because the Town of Frye Island is a creature of the State." *Frye Island I*, 2008 ME 27, ¶ 11 n.3, 940 A.2d 1065. We declined to address the issue directly because the individual plaintiffs in that case had a clear right to assert the constitutional claims. *Id.*

[¶38] "In the absence of state constitutional provisions safeguarding it to them," such as Maine's home rule provision, "municipalities have no inherent right of self government which is beyond the legislative control of the State." *Trenton v. New Jersey*, 262 U.S. 182, 187 (1923). As discussed above, L.D. 500 does not infringe on Frye Island's home rule authority. Therefore, Frye Island cannot sustain a challenge to L.D. 500 under the Equal Protection or Due Process Clause of the United States Constitution or the Maine Constitution.

[¶39] The court did not err in dismissing Frye Island's constitutional claims against MSAD 6 for failure to state a claim upon which relief can be granted.

2.  Hodge's and Rogers's Claims

[¶40] Hodge and Rogers argue that the court erred in dismissing their complaint because they sufficiently alleged an equal protection violation.[11]

[¶41] "The Fourteenth Amendment's Equal Protection Clause prohibits any state from denying to any person within its jurisdiction the equal protection of the laws, and requires, generally, that persons similarly situated

---

[11] Hodge and Rogers also argue that the court erred in concluding that they cannot assert an equal protection violation on behalf of Frye Island when it is treated differently from similarly situated municipalities. Hodge and Rogers cannot raise an equal protection challenge to L.D. 500 on behalf of Frye Island because Frye Island could not do so in its own right. *See, e.g.*, *Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 363-64 (2009); *Frye Island I*, 2008 ME 27, ¶ 11 n.3, 940 A.2d 1065; *South Portland v. State*, 476 A.2d 690, 696, 699 (Me. 1984). Therefore, we do not address this argument further.

be treated alike.  Article I, section 6-A of the Maine Constitution includes similar requirements."  *Doe v. Williams*, 2013 ME 24, ¶ 53, 61 A.3d 718 (alteration omitted) (quotation marks omitted).  In equal protection cases, "[i]f the government action does not implicate either a fundamental right or a suspect class, different treatment accorded to similarly situated persons need only be rationally related to a legitimate state interest."[12]  *Id.* ¶ 54 (quotation marks omitted).

[¶42]  Under this standard of review, government action "bears a strong presumption of validity."  *Anderson v. Town of Durham*, 2006 ME 39, ¶ 29, 895 A.2d 944.  "As a general rule, legislatures are presumed to have acted within their constitutional power despite the fact that, in practice, their laws result in some inequality."  *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992) (quotation marks omitted).  The party challenging the government action must show "that there exists no fairly conceivable set of facts that could ground a rational relationship between the challenged classification and the government's legitimate goals."  *Williams*, 2013 ME 24, ¶ 54, 61 A.3d 718 (quotation marks omitted).

---

[12]  On the other hand, when government action implicates a fundamental right or involves a "suspect classification," like race or ethnicity, a heightened level of review is appropriate.  *See, e.g.*, *Loving v. Virginia*, 388 U.S. 1, 11 (1967); *United States v. Carolene Products Co.*, 304 U.S. 144, 152 n.4 (1938).  This principle of equal protection jurisprudence is rooted in the idea "that any official action that treats a person differently on account of his race or ethnic origin is inherently suspect."  *See* *Fisher v. Univ. of Texas*, 570 U.S. 297, 310 (2013) (quotation marks omitted).

[¶43] Hodge and Rogers do not allege that L.D. 500 discriminates on the basis of a "suspect classification," such as race.[13] They allege only that they, as residents of Frye Island, are being treated differently than similarly situated taxpayers in other municipalities in that district. As the trial court observed, the situation giving rise to Hodge's and Rogers's equal protection claim is not much different than that of people who own second homes in Maine and pay property taxes on those homes, but do not send their children to schools in the district where their second homes are located. Nor is their situation all that different from that of homeowners who have no school-aged children—or no children at all—yet nevertheless pay property taxes.

[¶44] Hodge and Rogers attempt to distinguish their situation by arguing that unlike residents in other municipalities, they are prohibited from availing themselves of the school district withdrawal process laid out in section 1466. Their argument is flawed. Neither they nor any other Frye Island resident is

---

[13] *See Grutter v. Bollinger*, 539 U.S. 306, 326 (2003) ("[A]ll racial classifications imposed by government must be analyzed by a reviewing court under strict scrutiny. This means that such classifications are constitutional only if they are narrowly tailored to further compelling governmental interests." (citation omitted) (quotation marks omitted)); *Anderson v. Town of Durham*, 2006 ME 39, ¶ 29, 895 A.2d 944 ("If government action that is challenged on equal protection grounds infringes on a fundamental constitutional right, or involves an inherently suspect classification such as race, it is subject to analysis under the strict scrutiny standard. Strict scrutiny requires that the challenged action be narrowly tailored to achieve a compelling governmental interest." (citation omitted)).

categorically prohibited from petitioning for withdrawal from MSAD 6 under section 1466. They are merely required to take the additional step of obtaining authorization from the Legislature, in the form of an amendment to L.D. 500, before withdrawal. *See* P. & S. L. 2001, ch. 8, § 2. Further, even if we assume without deciding that Hodge and Rogers sufficiently alleged that, based on this "additional step," they are being treated differently than similarly situated taxpayers in other municipalities in MSAD 6, their equal protection argument fails.

[¶45] On these facts, because L.D. 500 does not implicate either a fundamental right or a suspect class, our review is limited to determining whether it is "rationally related to a legitimate state interest." *Williams*, 2013 ME 24, ¶ 54, 61 A.3d 718 (quotation marks omitted). We conclude that L.D. 500 is rationally related to the legitimate state interest of financing public education because it is concerned with a potential shortfall in MSAD 6's budget should Frye Island withdraw from MSAD 6. *Cf. Frye Island I*, 2008 ME 27, ¶ 17, 940 A.2d 1065 (rejecting an equal protection challenge to a statute exempting MSAD 6 from a statutory cost-sharing formula because not exempting MSAD 6 could cause a shortfall in the district's budget). As discussed above, the possibility that a future withdrawal agreement might provide for Frye Island to

make substantial yearly payments to MSAD 6 does not foreclose the possibility of an agreement that does not require such payments—a situation that could create a shortfall in MSAD 6's budget or require the other municipalities in the school unit to increase their contributions. L.D. 500 guards against the latter possibility by requiring Frye Island—uniquely situated in MSAD 6 because of its status as a summer community—to obtain authorization from the Legislature before attempting to withdraw under section 1466. *See* P. & S. L. 2001, ch. 8, § 2.

[¶46] Therefore, the court did not err in dismissing Hodge and Rogers's equal protection claims for failure to state a claim upon which relief can be granted.

[¶47] Hodge and Rogers also argue that a substantive due process violation was sufficiently alleged, and that the court erred in failing to apply a strict scrutiny analysis[14] to their claim because "LD 500 infringes upon [their] fundamental rights to vote and petition the government."

[¶48] Substantive due process turns on whether the challenged government action implicates a fundamental right. *Williams*, 2013 ME 24, ¶ 65,

---

[14] *See supra* n.13.

24

61 A.3d 718. If it does not, the action will be upheld if it is "reasonably related to a legitimate state interest." *Id.* ¶ 66.

[¶49] No fundamental right is implicated here. To the extent Hodge and Rogers argue that their right to vote on and petition for withdrawal from MSAD 6 is implicated, this argument is unavailing. Hodge and Rogers, in their capacity as residents of Frye Island, along with the other residents of Frye Island, remain free to petition the Legislature for approval to pursue statutory withdrawal under section 1466, to petition the Legislature to amend or repeal L.D. 500, and to petition the Executive Branch to support a repeal of L.D. 500.

[¶50] Moreover, there is no requirement under the Maine Constitution that the formation of school districts be submitted to a popular vote. *See McGary v. Barrows*, 163 A.2d 747, 754 (Me. 1960). The Legislature may create school districts by statute "without referendum to the people in the municipalities within the proposed district." *Town of North Berwick v. State Bd. of Educ.*, 227 A.2d 462, 468 (Me. 1967).

[¶51] Because no fundamental right is implicated and L.D. 500 is reasonably related to the legitimate state interest of financing public education, *cf. Frye Island I*, 2008 ME 27, ¶ 17, 940 A.2d 1065, we conclude that the court

committed no legal error in determining that Hodge and Rogers failed to state a claim upon which relief can be granted and dismissing their complaint.

The entry is:

Judgment affirmed.

---

Eric J. Wycoff, Esq, Catherine R. Connors, Esq., and Sara A. Murphy, Esq. (orally), Pierce Atwood LLP, Portland, for Appellants Town of Frye Island, Jim Hodge, and Ed Rogers

Agnieszka A. Dixon, Esq. (orally), Melissa A. Hewey, Esq., and Richard A. Spencer, Esq., Drummond Woodsum, Portland, for Appellee Board of Directors of Maine School Administrative District 6

Cumberland County Superior Court docket numbers CV-2018-8 and CV-2018-420
FOR CLERK REFERENCE ONLY